May it please the Court, the 9-11 on behalf of the appellants, Barja Inc. and 5710 Freeway Investment, Inc. This case arises out of a California law section, Business and Profession Code Section 2099.25, that requires an oil company, with respect to its franchisee, that if the oil company wants to divest or sell off its interest in the gas station property, it must first give the franchisee either a bona fide offer or a right of first refusal of a bona fide offer. And in this particular case, what happened was Shell Oil Company decided it wanted to divest its assets and it split up the gas stations that it owned into various clusters throughout California. And it set those clusters out for bid. And within each cluster, there were groups of stations that were supposed to be purchased pursuant to a bid process. And a third party, APRO Distribution, submitted bids on several clusters and ultimately won the bid on one of the clusters. The issue here is really threefold. One is because Shell Oil Company decided to offer a right of first refusal here to the franchisees rather than an individual bona fide offer. And the first question is whether they actually were offered a true right of first refusal of what the third party had offered to Shell Oil Company. And we submit that they didn't. The second question is whether... Let me just make sure that I understand. So does that encompass the notion that because of the fact that these bids were bundled or clustered, that the right of first refusal was to an offer that was different from what the offer was included in the bundle? I don't know if I'm making myself clear. Yes, I think you've touched on it, Your Honor. The deal that Shell Oil Company struck with the third party bidders, and this was part of the bidding requirements, was that the bidders weren't just bidding on individual sites. They were bidding on a bundle of rights. And within that bundle were the right to purchase the sites. Also, if their bid was accepted, because Shell Oil Company realized that they would have to give an opportunity to the dealer to buy the property. So if the dealer hadn't exercised the right to buy, the third party would buy the property and would also acquire the rights to supply fuel to all of the properties within the cluster. So if a particular dealer decided to buy the property and actually closed escrow on the property, then the third party would still acquire the right to supply, to basically step into Shell Oil Company's shoes to supply those stations. And was that right separately priced? No. I thought it was separately priced in the charge with a different price. There were several stages to the bid process. The first stage, the first round of bids, was simply a one global price for the entire cluster. I thought when they broke down the bid for each station that there was also a separate bid for the right of supply. Well, Ken Strong, who is the representative of Apro Distribution, which is a third party buyer, testified that when they valued the initial bid that they offered to Shell Oil Company. I have to ask you a technical question. Right. When they submitted, did they submit a price, whether it was a good price or a bad price or a fair price, a phony price for the right to supply? I believe there was some consideration by the third party buyer of what the right to supply was worth. It wasn't on the little chart with the prices? No. The prices that were the price allocations. Right. The price allocations. Right. And within those price allocations, they figured into it what is the right that we would get from collecting rental income from the properties because some of the properties weren't fee properties. Some of them were third party lease properties that were subject to expiration. I have the same confusion. I'm looking at Excerpt of Record 232. Yes. Which is a chart, and it has two numbers on it. And one is under a column that says revised 119 of Ken, and that's a bigger number. And then there's a second column that says supply price, and there's about $100,000 as to each of the two properties. Isn't that, in response to Judge Berzon's question, the bid in order to obtain the right to continue for 10 years, the supply of fuel to that location? Well, I think we first have to step back for a moment. Let's start with yes or no. Is that or is that not a bid for the right to supply? I think it's meant to be an allocation of what the right to supply might be. That's what I was trying to ask. Right. The answer is yes. That's what that is. That's an allocation, yes. All right. But whether it's right or not, whether economists would agree with that, obviously experts, I am sure, would differ. Correct. Except what we have to look at is how the bid process worked to understand what the argument is here. Because the initial offer that was made was one price for the entire kit and caboodle, so to speak. Is it your position that under California law that such an offer that included, as you call it, the kit and caboodle, is illegal? Yes. Well, not illegal. So if it's not illegal, your objection is what? That they didn't isolate it to the individual dealer locations? If the price, if the offer that is being made to the dealer, if the actual value that the third party would be receiving from the deal isn't readily apparent in the offer, then what we have to look at is not look at it as a right of first refusal, but we have to look at it in the context of like a bona fide offer. In other words, we have to But I thought your position was, and I thought it had been accepted by the court, that under the California statute, unlike the federal statute, the order has to be bona fide anyway. Yes. Well, that's a point of contention right now, because there really isn't case law other than the 49er case and the Sladky case, which is the federal counterpart to 49er, that examines that. And so partially we're looking to the court here for guidance on what that term means in the context of the California statute when it's not in the PMPA statute, which is the federal counterpart. I guess what I struggle with in your position is this. I certainly understand why your clients feel aggrieved, because they feel that this third-party offer sweetened things for the seller and that that's just not right. On the other hand, if they owned the entity here, they're going to look at it as a totality. You've got empty upstations, and some of them are very profitable. Some of them are not profitable. Some of them are lost leaders in areas where they feel they have to have them. But they want to maximize the total price that they get. Just speaking as a layperson here, it looks to me like what happened is that the seller said, okay, we've got some here, some there. Some of them are not doing anything for us at all, but we can maximize our return by offering this as a package and seeing what benefits we can get from supply agreements and the like. Is it your position that it is unlawful under California law for them to do so? And if so, what do you rely upon? The unlawfulness of it is in the way that they offer it to the dealer, not in the way that they solicit the bids, because Shell Oil Company is free to solicit the bids any way they want. Let's just say hypothetically that they put out the bid that they did, and one offeror says, okay, we'll buy these stations. And in addition to that, we will agree to buy fuel from you and provide it to these people. Some of the individual dealers get theirs, and they'll say, we will pay you X dollars, and we have nothing to do with the – I don't know that that's this deal, but they say, we're not interested in that other deal. Is it unlawful under California law for the seller to take the first offer because it gets the better deal from the first offer than the second offer? It's not unlawful for Shell Oil Company to accept an offer in any way that it's presented. Are you saying that the way it was presented was fraudulent or not in compliance with the law? No, the somewhat quote-unquote fraudulent is in the process that took place after the initial bid was submitted. But to answer Your Honor's question, stepping one step back, we have a legal constraint here. The legal constraint doesn't bind a third party. The legal constraint binds the oil company because there's a franchise relationship there. So there's public policy behind the legal constraint. And that public policy, if I understand it, is that it's not fair for somebody to work for years and years and years owning stations, and all of a sudden they don't have a right to do anything anymore. They don't get gas or whatever. So they want that to be stopped. The public policy is to encourage competition in the market with gas stations and not to allow gas stations to go out of business, which less gas stations means higher gas prices, and that's part of the public policy, to allow the gas stations to stay in business. Okay, get back to the example then that we talked about before. So the issue here is we have a legal constraint that dictates how an oil company is supposed to make an offer to the dealer. And so if a third party makes an offer that contains certain rights that the dealer can't possibly purchase, like the right to supply their own station with a fuel truck. But wouldn't that be true, though, also in terms of price? If a third party makes an offer, and I will have for a moment to say it's bona fide, but for purposes of our discussion, and they offer $100 million, some stupid, ridiculous price, and the dealer just doesn't have anything like that or a much smaller level, but it doesn't have that kind of money. Is that illegal? No. It's not? No. So what we're really talking about is the nature of the consideration. It's not necessarily dollars per se. It's services combined with dollars, which give a greater yield to shareholders. What is included in that price that is being offered is really the question here because, again, a third party is free to make an offer any way they wish. They can make an offer and say we're buying this, this, and this. And if some of those things the dealer can't possibly buy, which in reality, I mean, so just we know what we're talking about. The dealer has the right to buy the land, improvements, and equipment. That's it. That's really all the dealer can buy. Everything else is collateral. So when an offer contains a price that includes those things plus other things that the dealer is not buying, then it's incumbent on the oil company to present the offer to the dealer in such a way that it only incorporates the things that the dealer can buy, and that is the bona fide offer. And you rely on what part of the statute or case law for that position? That's the statute itself, Section 2999.25 and the 49er case. But isn't that the issue that the Fourth Circuit wrestled with in Keener when it said that, basically, the statute has to accommodate, in essence, different hands. Right. We're not levelizing, leveling the playing field here given the nature of a cluster offer. I understand that except it's different in this context. When we're talking about different hands, we're talking about a third party coming in with certain abilities. Maybe they have multiple stations. Maybe they have their own trucks where they can supply themselves. Maybe they can buy in bulk. So it comes – well, there are two forks in the road, it seems to me, at that point. One way to look at this is that you seem to be saying that if the buyer already had all the supply rights and for that reason was willing to pay more for the stations, that wouldn't be a problem. That's correct because that would be their own hand. That's what they're coming in with. This is here that they are buying the supply rights at the same time they're buying the other thing. Not just at the same time. They're buying it through the same instrument, the same contract. The third party's contract includes multiple stations, multiple rights, and that's the PSA, the purchase-sale agreement. But it's still only a problem. The only possible difference between those two examples would be that it is possible to, kind of surreptitiously or without acknowledging it, put some of the value of the supply contracts into the price of the leasehold or improvements when you're doing them both at once. That's the only relevance. It's not just that it's possible, but that it's impossible to really split out all of the rights that they're getting here. They're getting multimillion-dollar contracts to supply a bunch of stations. They're also getting the right. I mean, they could have had everything appraised and they could have. It's not conceptually impossible. I mean, as we noted earlier, this is why I started with this question. I mean, they did purport to separate out the price of the contract, of the supply contract. After the fact. Right. After the fact. This was all after the fact. Well, no. What difference does that make? Does that make a difference? It does. Because in this particular case, what Shell wanted was what it wanted. In other words, Shell wanted all of these rights to transfer, all these obligations to transfer, and Shell wanted a particular price for the entire thing. Shell was not splitting it out. That was not true in the other cases? Those other cases are different animals than this one. This is a unique situation. So Shell still wanted to get the best price possible, right? Yes, for the entire group, for the entire thing. I thought that's why there have been a series of cases about bulk sale. Yes, but in those cases, the facts are slightly different than the facts in this case. In those cases, you had a person coming in and saying, I want to buy multiple stations, and they would submit a bid for the land improvements and equipment of those multiple stations. And the dealer says, well, if you're bidding on multiple stations, then you have to split them out. You can't just give one global price. And the court says no, because when you have multiple stations where you're buying just land improvements and equipment, you can evaluate, you can do appraisals for all those stations, and you can figure out what each individual's worth. You're saying the reason this one's different is because they also had the supply rights. What else is there besides the supply? What's different here is you have the right to supply. You get the rental income from all the properties. Well, why wouldn't that be true in general when you're buying leaseholds? Because here they're not just buying fee properties. They're also buying leasehold properties. What you said is that it wasn't true in the other case? In the other case, it was just let – no, they weren't going to supply these stations for the old company. Just stick to one subject at a time. I said the difference is supply. You said, no, there's more. Right. Now you're telling me about the more. And I say, as to the more, wasn't that true in the other cases? Not exactly, no, Your Honor, because when an oil company buys a supply, typically the supply agreement is also bundled with the lease. They're not separate contracts. So if the third party buys the land without the supply, then when that lease expires, that third party can come in and basically take over because they're not the franchisor and the franchisee is thrown out under the PMPA. In this particular case, the third party is basically stepping into Shell's shoes and becoming the distributor. They're going to be the franchisor, in a sense, in Shell's shoes. So they're not only going to be supplying the property. They're also going to be collecting rent. They're going to be doing maintenance. They're stepping into the shoes, and the dealer remains as the dealer under the PMPA because they're not being terminated in this particular situation. If I can come at this from a slightly different point of view. The district court, as I read its order, found that those numbers that are listed on ER 232 for the valuation of the property was, in fact, a bona fide offer because that is what the putative purchaser was willing to pay for each of those stations. And so Shell or Equaline then turned around and made that same offer to your clients. What evidence do you have that that number is not a bona fide offer? Because that third party would not have made that offer, would not have purchased that station, were it not for their right to buy all the stations and supply all those stations. But you're not answering this question. Is there any evidence in the record that shows that these low-bid properties were actually worth more than what was in the appropriate? That the low-bid property? In other words, it should be less, wouldn't it? I'm sorry, less. Excuse me. Well, we have appraisal. We did an appraisal. But other than appraisal, that's it, right? Well, and when we have the initial offer that APRO made was $1.3 million, the initial allocation that APRO made was $1.3 million less than what the final offer was because when Shell looked at the entire global price, it said you need to raise that by another 1.3 million, or not by 1, by a larger amount. And 1.3 million was allocated to the Barja station and that price was raised. So the price was manipulated. It was more than what APRO originally allocated to that station. And that's also part of the problem here. So I think your answer to my question is, we believe there are genuine issues of material fact that are in dispute because we have supplied an appraisal that questions the validity of the number that is shown on that chart as not being anywhere near fair market value. We have the appraisal. We have the testimony of Ken Strong from APRO where he says we included in our valuation all of these things and that this was part of our offer and that they're buying everything. They're not just buying one station. And then we have the evidence and a testimony that they've increased the price. That isn't evidence of price manipulation, is it? That's evidence what a willing purchaser is willing to pay for this cluster of stations factoring in, I assume location is probably, what is it, location, location, location. That's the most important factor. And then we look at the volume of gasoline that's sold and we look at what the taxes are and all that has to get factored in, right? But they would need to look at those things if they were simply evaluating the land improvements and equipment. They only need to be looking at those things because they're evaluating the value they're going to receive from the gas sales at those properties, which is part of the bundle of rights they're getting. I'm just trying to understand why is that evidence of manipulation? The putative purchaser says I'm willing to pay $49 million, whatever the number was, for this cluster. And I don't really care how it's allocated. That's my assessment of what I think these stations are worth and what I'm going to earn long term off these properties. The manipulation comes from when they make an initial offer for the entire price without allocating anything. And in the second round bid, now they have to fit a square peg into a wrong box. They now have an amount that they've agreed on to pay for the entire thing and now they have to work backwards to allocate that amount. They did that and then Shell said no, we need to bump it up. We need a sweetener. We need more. And so then they have to reallocate. And in that reallocation, they raised the bid to our station, the Barges station, by another $1.3 million, which is a huge amount of money to just put towards that station. I thought it wasn't $1.3. I thought $1.3 was the total raise. No, it was $1.3 to that one station. I don't think it was. Anyway, thank you very much. Thank you. On your way of your time, we'll give you two minutes. May it please the Court. My name is Robin Wofford and I represent Ecolon Enterprises. The crux of this case comes down to two principles that I'd like this Court to keep in mind and clearly were ignored by the appellants but recognized by Judge Wright. The statute, Business and Professions Code 2099.25, is indisputably a government appropriation of property rights, but it is constitutional only because it is motivated by a legitimate state interest, and that is the preservation of gasoline stations for the motoring public. And so the statute provides minimal standards so as to limit government intrusion into the property rights of the franchisor. What the appellants are asking this Court to do today is ignore those limited minimal standards and ignore the deference that the 49er Court clearly acknowledged needs to be given. But the 49er Court did hold, as I understand it, that the California statute is different from the federal statute in that the right of first refusal has to be a bona fide offer and that has some content. Is that right? Absolutely. You are right. You're not arguing. So although he says that's in dispute, that is not in dispute. Absolutely that's not in dispute. But that has some consequences, which it means because it means that the federal cases are not directly transferable. I understand what you're saying, Your Honor. But 49er, I mean, our case right here is 100 percent on point with 49er. But it's what I said, correct, that we can't. But, for example, the Fourth Circuit case and others, there's another layer here in terms of the California statute. There is another layer, but you have to look to the PMPA federal cases that interpreted what a bona fide offer was. Right. And what 49er is saying. But they interpreted it. But in the federal statute, there are two distinct concepts, whereas here they're both applicable. Yes, Your Honor. And what 49er is saying is in the situation where the franchisor has gone to market to offer in a multi-site sale, they can make a right of first refusal of a bona fide offer. Two things have to be accomplished. Number one, on the face of the offer, there has to be an apparent price. And second, that there's no manipulation. Here to me, the one thing that wasn't mentioned earlier that I think is unique, but I'm not sure, is that the way this was set up, although there was an individual bid on the individual building, in fact, the way the agreements were set up, when the right of first refusal was not bought, that is not the sale was not under that agreement. It was under the bulk agreement. Does that matter at all? No, Your Honor. In other words, why? It doesn't matter because you can have, as the Keener Court acknowledged, a several different rights that are in a separate agreement. What matters here and what the 49er Court acknowledged here is- I don't know if you mean by several rights. You can, but the point was here you actually didn't. In other words, this separate offer was a little bit of a Potemkin village because, in fact, it was not meant to operate and it didn't operate. I'm sorry. I don't understand what you mean by that. The separate offer as to which the right of first refusal was mimicked, was set up such that if the sale actually occurred, it wasn't going to be the governing document. In fact, it lapsed and the actual sale was to be under the bulk sale and it was under the bulk sale. Is that right? Your Honor, it didn't lapse. The separate offer was set up exactly how 49ers suggest you could do it. In other words, we had APRO come in and they put an individual price on each P asset in the cluster. And that is clearly set out in Ken Strong's declaration. But in terms of the terms of the end, and I don't know what the differences are between the two if they exist, but in terms of the terms of the offer, the terms that ultimately governed were not those in the individual offer. Is that right? Your Honor, the terms of the offer made to BARJA are the same terms. The price is the same for the land improvements and equipment. What differs, and I will admit to you, what differs is if BARJA does not exercise its right of first refusal and APRO purchases the property, it is going to be governed by more stringent requirements than APRO would if APRO were to be buying the property. And EQUILAN made a separate offer to the dealer that didn't hamstring it with these other restrictions, including a 22-year supply, including a right of first refusal that EQUILAN hung on to if APRO wanted to sell any of these properties. There's nothing improper about having a severable other conditions of sale, severable from the right to purchase the property in this case. And I just want to get back to 49er. 49er, the court was looking at a right of first refusal and reversed a trial court judgment because of the way the court gave the jury instruction. It asked the court, I'm sorry, the jury instruction was look at anything reasonable and start looking at eight factors about the relationship between national, who was buying this national chain of sites, about the contracts between them, the terms and conditions, and the court said that's not standard when you're looking at a right of first refusal of a bona fide offer. The standard is look at the four principles because EQUILAN has every right to go to market and get the highest price a willing buyer is willing to pay. Is it your position that the four factors in 49er was the basis of what your client did in this case? Absolutely, and it's the basis of Judge Wright's ruling. Those four principles apply here. Their primary argument seems to be that there was manipulation that takes it out of the category here. What in particular would you say to refute the idea that the separate valuations that they came up with show that this was a little game that was being played here and that it wasn't, in fact, it didn't comply completely with the 49er's case? Your Honor, there is no evidence of manipulation. If you look at Ken Strong's declaration at 2871 through 2876, he says this is how they valued the properties. I assembled a team of people who evaluated the sites and established values for the bids for each site contained in the cluster. This is before they make their round one bid. And the way they valued them is approved by the courts. Buyers come to the table with different hands. Simply because APRO had a preexisting relationship where they could distribute gasoline in the entire L.A. and Orange County market so they could value a piece of property higher than the dealer might be able to doesn't make it manipulative, doesn't make it any less bona fide. And that's exactly what happened here. So from your perspective, there is no material issue of fact on that point? There's no evidence of that at all. There's no evidence that Equilon had anything to do with the values that APRO put on the sites. So then we go back to the four factors of 49er. The highest price a buyer is willing to pay is the best indicator of value. All we have to offer to sell are the pumps, dispensers, and equipment and land which allows them to continue to operate a gasoline station. And then we go to buyers come with different hands. It's okay if they have a strategic value. And thus the court said in 49er you can have a multi-site sale and analyze the bona fides of that offer by taking into account those four factors. Now one issue, and I don't know if the court wants to hear it because I know time is limited, but one issue the appellants are also asking this court to do is to look at the non-price terms and to scrutinize the non-price terms of this offer. And I submit to you they're asking this court to apply a commercially reasonable standard on non-price terms, and they're also saying that Equilon was obligated to, quote, give its entire interest. None of those two arguments are supported in the law. Still, let's not lose sight of the fact. Under this statute, it still gives Equilon the right to have a right of first refusal. So a third party has accepted all of the terms that the appellants are now saying need to be scrutinized under a commercially reasonable standard. The statute itself assumes and recognizes that the franchisor shell is going to sell its interest in the piece of property and going to then assign the franchise arrangement to the third party buyer. That's exactly what the parties did in 49er, and that was okay. But we have to, in this, in the appellants coming to this court and asking you to scrutinize every term of a third party. Kagan. Can I go back to more fundamental things? Sure. It seems to me that there are perhaps three pieces of evidence that might be relevant to whether summary judgment is proper as to the price, not to these terms. Okay. One of them is the appraisal. I understand that you say it was just their appraisal, but it's not. It just seems to me to have some pertinence to whether a price that is more than twice as high, two and a half times as high, is a bona fide offer. The second is the other bids on that same station, which I gather were considerably lower. And the third is the fact that when this reallocation was done, although there were 70 stations to which the reallocation could have been applied, something like two-thirds of it was applied to this one station. Okay. I will start with your first one. Are my facts right, first of all, the basic facts I've recited? I'm not 100 percent sure on your comment about considerably lower other bids. There's a lot of evidence. From what I can see, there was a bid from $1,500,000 and $1,000,000 and about $1,000,000. And another one, $1,500,000, another one was $1,200,000, and another one was $2,500,000. Okay. Yes. You're talking about the other bids for the cluster in the second round? Right. Okay. Yes, Your Honor. Okay. So your facts are correct. Okay. And I will first start with going back to the principles of 49er, which don't say anything about comparison of appraisals, even though if you look at 49er, in those cases, the appraisals were 67 to 64 percent of the offered prices. The appraisals are not taking into consideration that by allowing a right of first refusal, the court is allowing a franchisor to go to market and get the highest price a willing buyer is willing to pay. An appraisal is just an opinion of value. These facts are not relevant for that purpose. They are relevant for the purpose of testing a proposition that this price was not manipulated. But an appraisal is just an opinion of value. What needs to be determined if you are looking to see if this price was manipulated is, and there's no evidence of it, Echelon had no role in determining how these properties were going to be valued by a third-party buyer. But APRO also knew the entire lay of the land, including the fact that there was going to be a right of first refusal, and if it really wanted that particular station, it had every reason to pile all the value onto that station because it didn't want the right of first refusal to work. So in other words, I don't know that it has to be Echelon's manipulation. But if you look at the objective evidence of what the value of this station was, you have the evidence that APRO valued it in between $2.5 and $3.7 million on its initial valuation worksheet when it was valuing each of the pieces of property. That's number one. You have the original offer to Bargia from Echelon that was offering to sell this property for $4.7 million. You have the letters of intent from the various buyers that range from $2.5 to $4.5 million. That objective evidence does not reflect manipulation. It reflects that all Echelon did is let the market set the price for this piece of property. And APRO took into consideration proper items, like what they would earn from the revenues from this property. There's nothing wrong with that. That's how a buyer comes to the table. What occurs to me is that what's wrong here is that if you're going to make the market, you know, which is perfectly proper usually, it doesn't work very well when you have these bulk agreements and you have the ability to switch value from one property to another depending on which ones you think are going to be competitors and which ones you think there aren't. So to say that the market was setting the value doesn't seem accurate in the sense if the only relevant market is what APRO was offering because APRO was not offering individual, was going to buy things in bulk, and it wasn't terribly concerned about what the individual prices were. But the whole entire way APRO came up with its price for the bid was to apply individual prices. I thought APRO said we kind of eyeballed it. Excuse me? I thought what APRO said is we sort of eyeballed it. No, they didn't. That's not what they said. They said they didn't go out and get appraisals because they had the experience. What they said they did is they assembled a team of people who evaluated each site and established values for the bids for each asset being sold. They separated everything out, and then they came up with a total amount. That's what Paragraph 4 of Mr. Strong's Declaration says. There's nothing wrong with doing that. That's how National went ahead and valued the stations that the truck, the whole line of stations it was purchasing. There's nothing wrong with doing that. Ms. Wofford, if I understand your position, the plaintiffs are trying to convert this statute into something akin to an eminent domain proceeding where the role of the courts would be to hear evidence in order to establish the fair market value of the property for purposes of compensating the landowner. And your position is that's not what the statute requires. The statute simply requires evidence that is objectively reasonable that this is a bona fide offer as opposed to calling experts to establish through appraisals what the amount should actually be. Absolutely. That's my position. Maybe I didn't say it as eloquently as you. But it does say, and 49er did say that, we get to go to market. Fair market value is the highest price a willing buyer is willing to pay. And you're never going to get a true valuation of what a piece of property is worth unless the market sets that value. That's all fine if you have individual sales. Once you have these bulk sales, the question is what is the market setting? That's the problem. But that goes back to the second and third factors in 49er, Your Honor. Buyers come to the table with different hands. And just because APRO has a preexisting commercial ability to operate these stations in a more profitable manner doesn't mean their valuation is improper. We then give an individual price offer. But that's not the point. The point is that they are not actually making individual offers that matter to them because the individual prices don't matter to them. What matters is the bulk. So they can move things around because they want the group rather than more than they want the individual. So all it means is that you can't – there's nothing wrong with the bulk sales. There's nothing wrong with putting higher values on each individual station because of the bulk sales. It's just a question of figuring out what they're actually offering for each individual station. When they're stating what they're offering but they have no reason to make it accurate from their point of view. They have a reason to make it accurate because they want to be the prevailing bidders on the clusters. They're not going to fabricate. And they're not going to – it's logically – it's intuitive. A buyer is not going to over-offer to purchase a piece of property. And here – let's not lose sight of the fact here. Fries accepted. Let me just ask a question. Let me just go back to the original process. Your three points? I know you're over time. Okay. To the original process. When – I haven't been able to find the strong declaration. I will go look at it. But when he said whatever he said, did he include when he was valuing – did he include the supply rights? What Mr. Strong said – Go ahead. It's in his deposition at page 443, lines 19 through 444, line 1. The question was asked, so with respect to fee properties, there were multiple components to your bid, right? Answer, to the valuation of the bid, right? Question, right? That included land improvements, equipment, and the right to supply the station, correct? Yes. But, Your Honors, that's okay. I understand that. Okay. But I'm asking you whether the prices that you gave me before as to the individual valuations included the supply rights. It included their projections of profits. Right. Yes, and there's nothing improper about that. It's just like if a developer were coming to buy that piece of property, they're going to value it based upon what they can use that property for. APRO is stepping in, taking over the franchise relationship. They can only value it based upon how they can operate it. BARJA can value this piece of property completely differently. Why? Because if BARJA purchases this piece of property, they get to operate the station. They get to, perhaps, de-brand and go with another brand. There is a price to be paid to Equilon for the supply rights, right? The price to be paid for supply rights is if APRO, I'm sorry, if BARJA purchases the site. No, I mean for APRO to pay, you don't get the supply rights for free. Is that right? Correct. Okay. I'm asking whether that price was included in the estimates that were put together when they put together their original bid. No. That's what's broken out in the column in the second round bid. In the second round bid, but I'm asking you when you told me when the original, your main argument as to why there was a hands-length valuation of each individual property is that they did this when they originally put together their first bid. I'm asking whether those prices included the supply rights. What Mr. Strong testified to was that what they took into consideration was the location, potential fuel volumes, competition, square foot, traffic, proximity to freeways, configuration of the land, potential for proprietary appreciation, environmental conditions, all factors that are appropriate to be taken into consideration when evaluating the asset. What elements were different in the first round bid and the second round bid that accounted for the increase in the price? Were they valuing the same things or were new elements, new components added in the second round? Well, the components of the clusters changed significantly from the first round to the second round. In what way? Properties were pulled out of both clusters three and four, which was what APRA was successful on bidding on, so the components changed. So there were more components put in there in the second round? No, there were less. Some were less because they had less desirable properties and with less problems or what? No, Your Honor. Echelon always reserved the right to withdraw any site from a cluster bid, which was also a little bit of a way to protect from any type of manipulation because if Echelon would see that. But the price went up, so I'm trying to understand what caused the bidding price to go up. You're talking about the individual purchase price on the properties, not the whole cluster price. That is correct. Okay. Well, clearly what happened was APRA did not have the highest bid for once we got to the remainder of the cluster, and there was the negotiation that Echelon wanted $2 million more for the cluster and more gallons. And they negotiated and they agreed to $1.3 million. And Judge Berzon, you asked about the allocation of that $1.3 million. And contrary to what Mr. Lebedev did say, it wasn't all put. The $1.3 million was not put on the Olympic Station. Well, if you look at the numbers, Your Honor, there was a 35% increase in the price on the Olympic Station. There was a 22% increase on the price in the Fry Station. There was a 17% increase on another piece of property, and I forget the site, and then 7%. So all of the $1.3 was split amongst the fee properties, but not with any direction from Echelon. APRA decided what are they willing to pay for the pieces of property. So that answers your – I hope that answers Your Honor's question. And APRA did that just based on I want these properties, so I'm going to increase the price. Well, yes. I mean, the testimony before you, especially from Ken Strong, is let's not lose sight of where this piece of property is. It's on West Olympic and Bundy, one of the nicest corners in the high-volume location. And this was an internal decision on its part. It wasn't any discussion with Barge, obviously. There's no – no, none whatsoever. Okay. We have let you go on and on, and that was for our benefit, but thank you very much. Thank you, Your Honor. I appreciate it.  Thank you, Your Honor. Just really quick. What would be most helpful to me is to understand honestly, distinctly, and without rhetoric, the relationship between the purchase price and the supply rights at various points in the bidding process. Mr. Strong testified, and that can be found on page 432 of the record, that when the bid was submitted and they were coming up with the values, that they contemplated getting the rental income from the property and the supply of the property. So that's on the initial bid that was formed, the bulk amount. It included those factors. It included those rights. And that's why I'm saying that once that was included in the original price, you can't unbundle that, because that is the offer that's being made. After that, whatever happened as far as the price is concerned, whatever allocations happened, it was all to fit into the initial offer that was made. It wasn't like APRA started from the ground up and said, this is what we'll pay for supply, this is what we'll pay for the land. And to piggyback on that, Shell could have done this very easily. They could have had, as Ms. Wofford indicated, they could have had a separate contract for supply rights, and they could have separate contracts for just the land equipment and improvements, which would have been similar to 49er. They didn't do that. They had it all in one contract. And the reason they did that is. Mr. Lubetov, there's nothing wrong with that from a commercial standpoint. I mean, Shell said, I want $2 million more than whatever their original bid was, and they ultimately dicker and they get an extra $1.3 million by manipulating the terms of the supply contract that's between Equilon and APRA. Isn't that what I heard Ms. Wofford say? Right, except if we're going to follow the statute, we have to look at it. Is this a true right of first refusal where the same terms offered by the third party are being conveyed and are transparent to the dealer? Or is this a bona fide offer where we don't care about what the terms are with APRA? All we care about is what the value is. But from Equilon's standpoint, there is value in a continuing fuel supply relationship, right? Sure. On a wholesale basis. But Equilon could have done this. To address what your Honor is saying, Equilon could have done exactly what your Honor is suggesting. They could have had the purchase and sale agreement, the bulk agreement, just like they have with APRA. But when they make the offer to the dealers, they can make those offers based on a fair market valuation of just the land equipment and improvements. But a gas station is valueless if it doesn't have a fuel supply in order to keep it supplied with gas. Well, but the franchisee will continue to have the fuel supply as the franchisee. They're not being terminated. But if the law says that we have to determine whether it's objectively reasonable and a bona fide offer, what's improper about considering, as one of the factors, long-term fuel supply to that location? What's improper is that the dealer cannot benefit from those rights, but the dealer is paying for them. The dealer is matching, which is the definition of right of first refusal, of what a third party is willing to pay or what the third party has offered to pay. But the problem here is that an individual dealer cannot contractually commit itself to buy the millions of gallons of fuel that are otherwise on the table as between APRO and EQUILON. That's correct. And that's worth far more to EQUILON than whatever it's going to get for a gas station. That's correct, which is why this is not a true right of first refusal. This is exactly why we have to follow the criteria in 49er. And Ellis v. Mobile Oil explains what the parameters of a bona fide offer are. And we have to follow those parameters. We have to evaluate. But you would have the court adopt the rule that, in essence, that it has to be a different offer. In a bold transaction such as this, yes. I'm going back to Keener, in which the court in the Fourth Circuit said that's not commercial reality. And that's what I'm struggling with. Well, again, the difference in Keener is you have parties coming in with their own abilities. Here they're buying those things as part of an offer. And that is then being conveyed to the dealer. So what is the dealer being asked to pay for? Buying with regard to the supply rights. What APRO was going to do is be a middleman on the sale of all fuel for all of these stations? APRO is what's called a jobber in the industry. They're like the middleman. They pick up the fuel from the refinery. They have trucks and they deliver it to the franchisee. And then the franchisee pays them for the wholesale price of that fuel. So in other words, instead of Shell being the one to collect the money for the wholesale price of the fuel, APRO is collecting that money because APRO is basically buying the contract, the franchise agreement from Shell, in a sense, and stepping into their shoes. APRO is becoming a franchise? EQUILON to EQUILON is because EQUILON is then going to have to contract to sell a certain amount of fuel for that reason. Right. EQUILON is a fully integrated company where they refine the fuel and they deliver it. And EQUILON has decided as a company we don't want to deliver it anymore. We're going to refine it. We're going to let companies like APRO pick it up at the refinery and deliver it and deal with the dealers and deal with the environmental concerns and deal with the trucks. We don't want to get out of that aspect. We don't want to deal with that. We just want to do the refinery side of it and sell it to the jobbers. We don't want to deal with the dealers. Just one other question. I thought I heard you say a minute ago, and I want to be sure I understood this correctly, that because the offer that was made was not the same offer, it was not a right of first refusal by definition. Therefore, you have to go under the bona fide offer approach. Is that what you said? That's what I said, which is what 49er explains. And also, I want to briefly touch on what Ms. Walker said as far as the terms themselves are concerned, and that we have language in 49er and we have language in Slatke, and specifically in Slatke the court said that the court should have made specific findings as to the objective reasonableness of the franchisor's offer. That's in the Slatke case. In the 49er case, even though it's in the footnote, the reason it's in the footnote is because that wasn't an issue in that case, but the court made a point of pointing out that the terms sometimes need to be examined as well for their objective reasonableness because you can have oil companies trying to manipulate because the whole purpose here is if Shell sells off all of these properties and if Shell gets out of the distribution business, then how is Shell going to make sure that there's a market out there for its fuel that it's going to be refining? So it has to have its brand out there, and the way that it did it is by having a bid process like this where they're going to have third parties bid in order to make sure that because the PSA ties them into a long-term agreement with Shell that these properties are all going to be Shell stations. What evidence in the record shows that? I know in your individual, that's your interpretation, but is there anything that shows that that was in fact their motivation? Well, there's all kinds of things in the record, but there's an easy way to point this out. On page 762 of the record is the group divestment proposal, and that is Shell's internal way of approving a third-party offer, and that explains kind of what Shell's intent is. But that's basically the key here is that Shell wants to make sure that they're going to have outlets for their fuel, and so they have a deal in a bulk sale transaction where the third party can buy the properties, but only if they agree that these are going to stay Shell for a period of years and that they're going to continue to be supplied in that way, and that's in the PSA as well. But they cannot force that upon the dealer because of the PMPA. They cannot say that the dealer has to agree to a long-term supply agreement as a condition of accepting this offer, and so for the dealer, they have to give them just an offer for the land improvements and equipment. They can't even offer the goodwill because the goodwill belongs to the dealer. And so in a situation where you can't unbundle the rights that are being purchased by the third party, you have to go to an appraisal or some other way, some other evidence to establish what that value is. Not to prolong this, but in 49er, for example, was this a factor or any of the other cases? It was a factor, but not to this extent. In other words, in 49er, they weren't buying the right to supply. They were just buying a bulk of station. I know. I'm asking whether the right to supply was a factor. It was not. All right. Thank both of you. Thank you. All of you very much for your help in a very difficult case. Thank you. And learning something new, which we didn't know about or I didn't know about. We look forward to listening to the transcript. The case of Barger, Inc. v. Equilan Enterprises is submitted.
judges: Berzon, Tallman, Smith